UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　Case No. 3:25-cv-

APPROXIMATELY $573,914.63
SEIZED FROM PNC BANK ACCOUNT
#4698945636 HELD IN THE NAME OF
TOP RANK DIAGNOSTIC LAB, LLC

    Defendant.

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

In accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Plaintiff, the United States, brings this complaint and alleges upon information and belief as follows:

### NATURE OF THE ACTION

1. This is a civil action *in rem* to forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and Supplemental Rule G(2), approximately $573,914.63 seized from PNC Bank Account #4698945636, held in the name of Top Rank Diagnostic Lab, LLC ("Defendant Funds"), on the grounds that the funds are proceeds obtained from health care fraud offenses, in violation of 18 U.S.C. § 1347.

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over an action commenced by

the United States by virtue of 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355.

3. This Court has *in rem* jurisdiction over the Defendant Funds pursuant to 28 U.S.C. § 1355(b)(1)(A), because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

4. Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1355(b)(1), because pertinent facts or omissions giving rise to the forfeiture occurred in this District.

5. Because the Defendant Funds are in the government's possession, custody, and control, the United States requests that the Clerk of Court issue an arrest warrant *in rem*, upon the filing of the complaint, pursuant to Supplemental Rule G(3)(b)(i). The United States will then execute the warrant on the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## THE DEFENDANT *IN REM*

6. The Defendant Funds consist of approximately $573,914.63 seized from PNC Bank Account #4698945636 held in the name of Top Rank Diagnostic Lab, LLC ("the Subject Account"). On or about June 13, 2025, the Defendant Funds were seized by the Federal Bureau of Investigation ("FBI") pursuant to a federal seizure warrant issued by a United States Magistrate Judge after finding probable cause that the Defendant Funds were subject to forfeiture. The Defendant Funds are currently held in the United States Department of Justice Seized Assets Deposit Fund

("SADF").

7.  As set as set forth in Supplemental Rule G(3)(b)(i), the Clerk of Court must issue a warrant to arrest the Defendant Funds if they are in the government's possession, custody, or control.

## BASIS FOR FORFEITURE

8.  The Defendant Assets represent proceeds of health care fraud offenses, in violation of 18 U.S.C. § 1347.

9.  The Defendant Assets are therefore subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) provides for the civil forfeiture of any property which constitutes or is derived from proceeds from any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7). A "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7)(F), includes any act or activity constituting an offense involving a "Federal health care offense." Pursuant to 18 U.S.C. § 24(a), the term "Federal health care offense" means a violation of, or a criminal conspiracy to violate, 18 U.S.C. § 1347 (as well as several other offenses), if the violation or conspiracy relates to a health care benefit program.[1]

10. Pursuant to 18 U.S.C. § 984, in any forfeiture action *in rem* in which the

---

[1] The term "health care benefit program" is defined at 18 U.S.C. § 24(b) to mean any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, including any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

3

subject property is funds deposited in an account in a financial institution, any identical property found in the same account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture so long as an action is commenced within one year from the date of the offense.

11. As required by Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, they support a reasonable belief that the government will be able to show by a preponderance of the evidence that the Defendant Funds are proceeds of health care fraud.

## FACTS

12. Specific details of the facts and circumstances supporting the forfeiture of the Defendant Funds have been provided by FBI Special Agent Eric Petersen who has been a Special Agent with the FBI for over fourteen years. Since 2018, SA Petersen has been assigned to the Jacksonville Field Office, where he has conducted white-collar crime investigations, to include complex financial crimes against the United States health care system. SA Petersen has personally participated in this investigation since May 2025. The following facts are based on SA Petersen's personal knowledge of this investigation, which come from his review of witness interviews, reports of other investigators, documents, including billing records and claims information, and from performing data analysis. He is familiar with the Medicare program and the procedures for payment of Medicare benefits as a result of

his training and experience investigating numerous Medicare fraud offenses.

## I. The Medicare Program

13. The Medicare Program ("Medicare") is a federally-funded program that provides free and below-cost health care benefits to people age 65 years or older, the blind, and the disabled. The Centers for Medicare & Medicaid Services ("CMS"), an agency of HHS, is responsible for the administration of Medicare. Medicare is a health care benefit program as defined by 18 U.S.C. § 24(b).

14. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D"). Part B covers outpatient physician services, such as office visits, minor surgical procedures, durable medical equipment ("DME"), and laboratory services, such as drug testing and genetic testing, when certain criteria are met.

15. "Part C" of Medicare, commonly referred to as "Medicare Advantage," provides enrolled beneficiaries with services typically covered under Parts A and B, in addition to mandatory and optional supplemental benefits, and is administered by private insurance companies.

16. Medicare "Providers" include clinical laboratories, physicians, DME companies, and other health care providers who provide items and services to beneficiaries. A beneficiary eligible for Medicare may choose to be covered under

"original" Medicare, where qualifying items and services are covered under Parts A and B, or under Part C (Medicare Advantage). A beneficiary who selects coverage under Medicare Advantage enrolls in a Medicare Advantage plan managed by a private insurance company ("Medicare Advantage Plan"). *See* Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395w-21 to 1395w-28.

17. Under Part C, the Government pays a Medicare Advantage Plan a monthly fixed, capitated (per beneficiary) amount, adjusted by the expected risk of each beneficiary. Medicare Advantage Plans are required to provide at least the same benefits as traditional Medicare. Medicare Advantage Plans must "provide coverage of, by furnishing, arranging for, or making payment for, all services that are covered by Medicare Part A and Part B," which includes coverage for DME. *See* 42 U.S.C. § 1395w–22(a)(1); 42 C.F.R. § 422.101.

18. Medicare Advantage Plans receive, adjudicate, and pay claims from providers seeking reimbursement for the cost of health care benefits, items, or services provided to Medicare beneficiaries. While the majority of providers submitting claims to any given Medicare Advantage plan will be considered in-network, Medicare Advantage plans will also adjudicate and pay for out-of-network providers who provide services to the beneficiaries covered under that plan. Each Medicare Advantage Plan operates an internal investigation unit responsible for conducting investigations of potential fraud, waste, and abuse. *See* 42 C.F.R. §422.503(b)(4)(vi).

19. Medicare Advantage Plans must comply with CMS's general coverage guidelines included in Medicare manuals and instructions unless superseded by CMS's Part C regulations or related instructions. *See* 42 C.F.R. § 422.101(b)(2). No Medicare payment may be made under Part A or Part B for any expenses incurred for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* 42 U.S.C. § 1395y(a)(1)(A). Accordingly, Medicare Advantage Plans may not pay for items or services that are not medically necessary. *See also* 42 C.F.R. § 422.1122(a)(6) and Medicare Managed Care Manual, Chapter 4, Sections 10.2 and 10.16.

20. Each Medicare beneficiary is identified with a unique beneficiary identification number. These beneficiary identification numbers are used to determine a beneficiary's eligibility for Medicare benefits and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services.

21. When submitting claims to Medicare for COVID-19 tests, providers use healthcare common procedure coding system ("HCPCS") codes that identify, describe, and code medical, surgical, and diagnostic services performed by practicing physicians and other health care providers. These codes are used to determine the reimbursement. The HCPCS code relevant to this case, 0240U, is a Proprietary Laboratory Analyses ("PLA") code, which means that the code applies to only one unique lab test made by a specific manufacturer or performed by a specific lab. In

this case, 0240U refers to the Xpert® Xpress SARS–CoV–2/Flu/RSV (SARS–CoV–2 and flu targets only) from Cepheid. The test provides rapid detection and differentiation of SARS–CoV–2 (the virus that causes COVID–19) and influenza viruses.

22.     When a Medicare claim form is submitted, the provider certifies that the contents of the form are true, correct, and complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program. On the form, the Medicare provider certifies that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations." The form advises the provider that "anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws."

## II.     Top Rank Diagnostic Lab, LLC

23.     Top Rank Diagnostic Lab, LLC ("Top Rank") is a business organized in California and registered with Medicare as a clinical laboratory in Yorba Linda, California. Top Rank's Articles of Organization were filed with the California Secretary of State on November 15, 2022. According to the Articles of Organization, Top Rank's principal and mailing address was 1400 Reynolds Avenue, Suite 302 in

Irvine, California, and its Organizer was S.S. On September 21, 2024, S.S., as Manager, Agent for Service of Process, and CEO, filed a Statement of Information changing Top Rank's principal and mailing address to 22875 Savi Ranch Parkway, Unit B in Yorba Linda, California. On March 3, 2025, another Statement of Information was filed changing Top Rank's Manager, Agent for Service of Process, and CEO from S.S. to Samiuddin Mohammed.

### III.  Health Care Fraud Offenses

24. In approximately November 2023, Top Rank enrolled as a Medicare Part C provider, and in approximately April 2025, after changing ownership, it began billing Medicare for COVID-19 and Influenza tests. As a result of Top Rank changing its location of record in September 2024, and changing its manager, agent for service of process, and CEO in March 2025, it appears that Top Rank was sold and/or transferred ownership from S.S. to Mohammed by no later than March 2025. The following month, Top Rank began billing Medicare for the purported provision of COVID-19 and influenza tests.

25. Prior to the transfer of the lab to Mohammed, Top Rank had never submitted any Medicare claims to any Medicare Part C entity. After the transfer, Top Rank began submitting tens of thousands of claims to various Medicare Advantage plans as an out-of-network provider. From approximately April 7, 2025, until June 7, 2025, Top Rank submitted 42,352 claims to Medicare Part C plans on behalf of 3,523 beneficiaries for the provision of a specific COVID-19 and influenza

test manufactured by Cepheid, using only one billing code: 0240U. Similarly, all of the claims submitted to Medicare used the name and credentials of physician F.S. Top Rank billed Medicare approximately $12,940,500 for the above-referenced COVID-19 and influenza test. Medicare paid Top Rank approximately $3,020,023 based on those claims.

26.     On May 15, 2025, HHS-OIG Special Agent Christian Jurs interviewed seven Medicare beneficiaries for whom Top Rank billed Medicare. All of the beneficiaries interviewed reside in the Middle District of Florida. Specifically, six of the seven beneficiaries reside in Jacksonville, and one resides in St. Augustine. None of the beneficiaries were familiar with Top Rank, nor had they received the COVID-19/Influenza tests. Similarly, none of the beneficiaries appeared to have the medical necessity for the receipt of the tests during the relevant timeframe. And finally, none of the beneficiaries were familiar with F.S. nor had any physician-patient relationship with her. Below is a summary chart depicting the content and number of claims filed by Top Rank with Humana's Medicare Advantage Plan, for each interviewed beneficiary.

| Beneficiary | Dates of Service | Number of Claims | Dates Claims Submitted | Total Billed to Medicare | Total Paid by Medicare | HCPCS Code | Diagnosis |
| --- | --- | --- | --- | --- | --- | --- | --- |
| A.D. | June 4, 2024 – March 27, 2025 | 43 | May 6-10, 2025 | $12,900 | $6,133 | 0240U | Acute cough |
| B.B. | May 28, 2024 – March 27, 2025 | 13 | May 12, 2025 | $3,900 | $1,854 | 0240U | Acute cough |
| B.C. | May 14, 2024 – March 27, 2025 | 13 | May 12, 2025 | $3,900 | $1,854 | 0240U | Acute cough |
| J.H. | June 4, 2024 – February 27, 2025 | 16 | May 12, 2025 | $4,800 | $2,282 | 0240U | Acute cough |
| J.A. | June 4, 2024 – February 27, 2025 | 17 | May 12, 2025 | $5,100 | $2,424 | 0240U | Acute cough |
| L.A. | May 29 – August 29, 2024 | 6 | May 12, 2025 | $1,800 | $855 | 0240U | Acute cough |
| P.F. | May 14, 2024 – March 13, 2025 | 19 | May 12, 2025 | $5,700 | $2,709 | 0240U | Acute cough |

27. From April 7, 2025, to May 12, 2025, Top Rank submitted 2,553 claims to Medicare Part C on behalf of 151 beneficiaries located in the Middle District of Florida. These claims reflect dates of service between February 27, 2024, and May 8, 2025, and were submitted to Medicare between April 14, 2025, and May 12, 2025. These 2,553 claims billed Medicare a total of $765,900, of which Medicare paid Top Rank approximately $364,134. All of these claims list either "acute cough" or "contact with and expected exposure to COVID-19" as the diagnoses to justify the medical necessity for the claim, all are for the provision of HCPCS code 0240U, and all list F.S. as the referring physician.

28. This billing is highly consistent with known patterns of billing from similar schemes in which providers illegally purchase beneficiary lists and personal information and bill fraudulent claims without actual medical necessity or authorization. Also, in Medicare investigations in which the Medicare providers rapidly bill for fraudulent and fictitious claims, beneficiaries often have no prior physician-patient relationship with the referring physician. To ascertain if a preexisting relationship exists and to determine if the prescribing physician had ever previously submitted a claim to Medicare for treating the beneficiary for any medical issue, the physician listed as the prescribing doctor in the claim submitted to Medicare is compared with outpatient billing submitted to Part B and Part C of the Medicare program.

29. Of the claims submitted between April 14, 2025, and May 12, 2025, there were no claims in which the beneficiary and F.S. had ever seen one another. In

other words, 100% of the claims list a beneficiary and prescribing physician who had no prior relationship as doctor and patient during the period in which F.S. was purportedly referring the patient to Top Rank.

## IV. Receipt of Medicare Fraud Proceeds

30. On April 11, 2025, Top Rank registered PNC Bank Account #4698945636 with Humana for the receipt of electronic funds transfer ("EFT"). This account listed an address of 22875 Savi Ranch Parkway, Suite B, Yorba Linda, California, a National Provider Identifier number of 1821708439, and a Tax Identification Number of 921063098. Both identification numbers are associated with Top Rank. Between April 23, 2025, and May 13, 2025, Humana paid Top Rank's PNC Bank account approximately $2,480,646 as reimbursement for the false and fraudulent claims as described in this affidavit. Because this account received $2,480,646 in health care fraud proceeds within the past year, pursuant to 18 U.S.C. § 984, up to $2,480,646 is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

31. On June 13, 2025, the FBI seized the funds that remained in the account, which amounted to approximately $573,914.63.

## CONCLUSION

32. As required by Supplemental Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, probable cause exists to believe that the Defendant Funds

are proceeds of health care fraud offenses, obtained in violation of 18 U.S.C. § 1347. Therefore, the Defendant Funds are subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

Dated: November 10, 2025

Respectfully Submitted,

GREGORY W. KEHOE
United States Attorney

By: _____
JENNIFER M. HARRINGTON
Assistant United States Attorney
Florida Bar No. 0117748
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
(407) 648-7500 – telephone
(407) 648-7643 – facsimile
E-mail: jennifer.harrington2@usdoj.gov

**VERIFICATION**

I, Eric Petersen, hereby verify and declare under penalty of perjury, that I am a Special Agent with the Federal Bureau of Investigation, and pursuant to 28 U.S.C. § 1746: (1) I have read the foregoing Verified Complaint for Forfeiture *in Rem* and know the contents thereof; and (2) that the matters contained in the Verified Complaint are true to my own knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the Federal Bureau of Investigation, as well as my investigation of this case together with other law enforcement agents. I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of November 2025.

_____
Eric Petersen
Special Agent
Federal Bureau of Investigation